IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JEFFERY HACKELOER,

                Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                Defendant.

OPINION AND ORDER

15-cv-628-wmc

---

Pursuant to 42 U.S.C. § 405(g), plaintiff Jeffery Hackeloer seeks judicial review of a final decision of defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, which denied his application for Social Security Disability Insurance Benefits and Supplemental Social Security Income. In his appeal, plaintiff contends that the administrative law judge erred by (1) rejecting the opinion of a consultative examiner, Dr. Kurt Weber, and (2) "cherry-picking" the opinion of examining physician, Dr. Michael Stotz. The court held a telephonic hearing on this appeal, at which the parties appeared by counsel. For the reasons provided below, the court rejects both challenges and will affirm the denial of benefits.

BACKGROUND[1]

**A. Claimant**

Hackeloer was born on February 9, 1965. He applied for both SSDI and SSI in 2012, some seven years after his original claimed disability onset date of January 26, 2005.

---

[1] The administrative record ("AR") is available at dkt. #7.

At the March 2014 hearing in front of the ALJ, he requested to amend his onset date to September 1, 2006. He was 39 years-old at the date of the alleged onset of his disability, 47 years-old when he applied for disability, and 49 years-old at the time of his third hearing in March 2014. Hackeloer has a limited education, is able to communicate in English, and has past work experience as a mail handler. Hackeloer last worked in 2005. He claims disability based on a combination of degenerative disk disease of the lumbar spine, status post fractured left femur, obesity, depression, renal failure and fibromyalgia.

### B. Medical Record

In his application for SSI, Hackeloer reported that he had not seen a doctor for six to seven years because of a lack of health insurance. (AR 311.) As a result, his medical record is quite thin. In his March 2012 application for social security benefits, Hackeloer principally complained of back, neck and knee pain, and numbness. He claimed that he could not walk, sit or stand for long periods of time. (AR 303.) Despite these limitations, he reported that he helped with housework with frequent breaks, including cleaning, laundry and mowing, and he babysat his grandson two to three hours per week. (AR 304-05.) Hackeloer also reported that he walked every day, about two and a half miles, which would take him about one and a quarter hour, though he had to take breaks about every five minutes or quarter mile. (AR 308.) Later in the same report, however, Hackeloer represented that he could walk for about 15 to 30 minutes without a break and that he could only walk a half hour per day. (AR 311.)

After he applied for benefits, Hackeloer met with two doctors for consultative examinations. In April 2012, Dr. Kurt Weber saw Hackeloer for a consultative mental

status examination. Dr. Weber diagnosed Hackeloer with mild depression and assessed his work capacity as follows:

> mild limitations in the ability to understand, remember and carry out simple instructions,
>
> moderate interference in the ability to respond appropriately to supervisors and co-workers,
>
> mild to moderate limitations in the ability to maintain concentration, attention and work pace,
>
> moderate limitation in the ability to withstand routine work stresses, and
>
> moderate limitations in the ability to adapt to change in the work environment.

(AR 373-79.)

Also in April 2012, Michael Stotz, D.O., saw Hackeloer for a disability examination. (AR 382-90.) In his interview with Stotz, Hackeloer reported having "difficulty walking for about one year following [left leg] surgery" in 2004 and that he had no physical therapy or rehabilitation due to a lack of health insurance. (AR 384.) About two years after his surgery, Hackeloer reported experiencing low back pain that "has progressed and now also . . . neck pain." (*Id.*) He also reported continued pain in his left thigh and numbness running down into the lower leg.

At the time he applied for benefits, Hackeloer was still able to perform about two hours of housework per day, but then reported experiencing pain for two to three days. Hackeloer also reported that he could lift up to 50 pounds and walk up to two miles per day, but would experience left leg numbness after one mile of walking, which was mostly relieved with rest. (*Id.*) With respect to his neck pain, Hackeloer reported some discomfort

3

turning his head to the left, but denied any pain radiating into his arm. He treated his neck pain with a heating pad, aspirin and occasional Tylenol.

Dr. Stotz's physical examination of Hackeloer's back revealed:

> normal range of motion of the thoracic and lumbar spines. Some discomfort in lumbar rotation. No significant atrophy or signs of scoliosis. Tenderness to palpation in the midline at approximately L4-L5.

(AR 385.) With respect to Hackeloer's neck, the physical exam revealed: "active range of motion normal in all planes except of loss of about 10 degrees rotation to the left which also produces some discomfort. No tenderness to palpation." (*Id.*)

The record also reveals two x-rays in April 2012, both of which Stotz also reviewed. The first x-ray was of Hackeloer's hips. (AR 388.)[2] The radiologist described

> an intramedullary nail traversing and old healed proximal diaphyseal fracture with 2 interlocking his screws in the left femoral head and neck and 2 proximal femoral cerclage wires. No evidence of hardware loosening. No evidence of acute fracture. The bony anatomy is in normal anatomic alignment. The left hip joint space is maintained.

(AR 388.) The second x-ray was of Hackeloer's lumbar spine. (AR 390.) That x-ray revealed:

> small anterior ostephyte formation at the L2-L3 and L3-L4 levels with preserved disk space at the L2-L3 level and mild disk space narrowing at the L3-L4 and L4-L5 levels, consistent with mild degenerative disk disease at the L3-L4 and L4-L5 levels. There is mild degenerative disease involving the bilateral facts at the L4-L5 level. The bony anatomy is in the normal anatomic alignment.

(*Id.*)

---

[2] As context, Hackeloer complains of leg pain date back to August 2004, when he suffered a left proximal femur fracture, which required surgery. (AR 365-72.) He claims that he never regained full function and continues to experience pain. (AR 352.)

Based on his examination and limited medical history, Dr. Stotz concluded that Hackeloer's prognosis was "good." (AR 386.) With respect to his ability to work, Stotz then opined that "based on this patient's subjective history[,] he would have some difficulty performing the following work-related activities: standing in one spot longer than 15 minutes, walking greater than one mile, and traveling for greater than one hour." (*Id.*) Stotz concluded

> objectively, [Hackeloer] seems to have good muscle strength in the upper and lower extremities. He has some discomfort of the right great toe affecting his ambulation which would benefit from evaluation. Otherwise he would not appear to have any difficulty performing the following work-related activities: lifting and carrying objects less than 50 pounds, find handling of objects, seeing, hearing, or speaking.

(*Id.*)

Syd Foster, D.O., next completed a review of Hackeloer's medical record in May 2012.[3] Based on this review, Dr. Foster opined that "giving the claimant the benefit of the doubt, it is reasonable to limit the claimant to work at the sedentary exertional level as work he could perform on a sustained basis." (AR 396.) As for his mental health, Foster concluded that "[c]laimant's reported symptoms are found to be credible but are mild in nature." (*Id.*) Foster further relied on the consulting examiner to conclude that "claimant is clearly capable of unskilled work despite his demoralization at this point due to his physical factors and lack of employment," and he was "capable of performing on a sustained basis the basic mental demands of unskilled work." (*Id.*) Foster next noted that in making these determinations, he gave great weight to the opinions of Drs. Weber and

---

[3] It appears that Kyla King, Psy.D, may also have reviewed the mental health records.

5

Stotz, finding that "[t]heir opinions were not inconsistent with the exam findings albeit they gave significant weight to the claimant's subjective reports." (AR 398.) Based on his review, therefore, Foster concluded that Hackeloer was not disabled.

On reconsideration, Pat Chan M.D., performed a second review of the medical record in November 2012. In his report, Dr. Chan discounted both Drs. Weber and Stotz's opinions, finding that they "relie[d] heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion." (AR 453.) Accordingly, Chan limited Hackeloer to light work, while similarly concluding that he was not disabled. (AR 454.)

Finally, in May 2013, Hackeloer saw Jad C. Roeske, M.D., for a general physical examination. (AR 472-73.) Dr. Roeske reported that Hackeloer complained of "pain on a daily basis in the left hip and low back and notices pain in the tops of his feet with increased walking." (AR 472.) This record, however, does not provide much, if any, information as to Roeske's opinions on Hackeloer's complaints of pain. Instead, Dr. Roeske simply noted that he was going to have his medical records reviewed by a disability attorney to see if he has a chance to appeal the initial denial, in which case Dr. Roeske would refer him to occupational medicine.

### C. ALJ's Decision

The ALJ found the following severe impairments: degenerative disk disease of the lumbar spine, status post fractured left femur and obesity. (AR 21.) The ALJ also considered whether Hackeloer's history with acute renal failure constitutes a severe

impairment,[4] but concluded that there was no evidence to support a finding that it was expected to last for a continuous period of more than 12 months. Relatedly, the ALJ concluded that Lyme disease was not a severe impairment because, although it was considered as a possible cause of the renal failure, it was ruled out. The ALJ noted that Hackeloer testified to a possible fibromyalgia diagnosis at the hearing, but rejected this as a severe impairment because of the lack of diagnosis. Indeed, as far as the court can discern, there is *no* mention of fibromyalgia in the medical record.

With respect to his depression, the ALJ concluded that it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." (AR 23.) As part of this determination, the ALJ reviewed Dr. Weber's consultative evaluation, giving it "only little weight as the doctor's examination is not wholly supported by the evidence." (AR 24.) In discounting Weber's opinions, the ALJ explained that the examination was "unremarkable," including a score of 26 on the MoCA.[5] (*Id.*) As such, the ALJ reasoned that Weber's opinions were based on the claimant's subjective complaints, which, in turn, were inconsistent with his daughter's reports and Hackeloer's own statements about his social functioning and concentration. The ALJ then walked through the functional area sets, known as "paragraph B" criteria," finding no restrictions with respect to daily living, social functioning and concentration

---

[4] The medical record reveals that Hackeloer was hospitalized for severe dehydration and acute renal failure in August 2012, though it appears to have resolved. (AR 417, 428-44, 477-78.)

[5] "A score of 26 or over is considered to be normal." "Montreal cognitive assessment," Wikipedia, https://en.wikipedia.org/wiki/Montreal_Cognitive_Assessment.

7

persistence and pace, and finding no episodes of decompensation. As such, the ALJ concluded that at most Hackeloer had mild limitations in any of those categories, and found Hackeloer's depression non-severe.

Based on his findings, the ALJ's RFC limited Hackeloer to medium work, except that he was further limited to lifting and/or carrying 50 pounds occasionally and 25 pounds frequently. In arriving at this RFC, the ALJ discounted Hackeloer's complaints of pain, finding that "[t]he claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations," specifically noting Hackeloer's statements that he "could babysit his grandson, take care of his parents, ride an ATV, play softball, play pool and cards with friends, and take care of household chores." (AR 27.) Furthermore, in reviewing the medical record, the ALJ concluded that he "received routine, conservative and non-emergency treatment since the alleged onset date." (*Id.*) The ALJ acknowledged that a 2006 CT scan and the more recent 2012 x-rays "are consistent with some abnormality of the claimant's back and show the history of the femur fracture," but "there is no evidence the claimant's impairments could not be conservatively managed." (AR 28.) Moreover, the ALJ relied on Hackeloer's lack of medical treatment in finding that the symptoms and limitations were not as severe as alleged.

As part of this discussion, the ALJ also addressed Hackeloer's lack of health insurance during a significant part of the relevant period, reasoning that he could have sought "no-cost treatment alternatives, such as a treatment at a public health clinic," and also noting that "despite his lack of medical treatment, he was able to perform a normal

level of daily activity." (AR 28.)

With respect to Dr. Stotz's opinion, the ALJ gave it only "partial weight" on the basis that it was based on Hackeloer's "subjective complaints," and for the reasons provided previously, there were "good reasons for questioning the reliability of the claimant's subjective complaints." (AR 29.) The ALJ also discounted the opinions of the state agency consultant physicians, who determined that Hackeloer could perform either sedentary or light work. He determined that those opinions were "inconsistent with the claimant's mild treatment, the lack of prescription medication, the opinions of [the medical experts at each of the three hearings], and the claimant's normal activities of daily living." (AR 31.)

In forming his RFC, the ALJ relied on the opinions of two of the three medical experts that were at the hearings. The ALJ discounted the opinion of the first medical expert, Dr. Francis, finding that his opinion was of limited value given that he could only provide a partial residual functional capacity based on the lack of evidence and his reliance on Dr. Stotz's opinion, which the ALJ had already discounted. Instead, the ALJ relied on the opinions of Dr. Raulston and Dr. Brahms, the medical experts at the second and third hearings, both of whom opined that Hackeloer would be capable of medium exertional work. (AR 30.)

The ALJ acknowledged that a non-examining source, like Raulston and Brahms, is not entitled to controlling weight, but concluded that both opinions were entitled to great weight because of their "awareness of all the medical evidence in the record, . . . understanding of Social Security disability programs and evidentiary programs," and that their opinions were "well supported by the conservative and limited objective medial

9

evidence already discussed in this decision." (AR 31.) Based on their assessment, the ALJ concluded that Hackeloer is capable of performing his past relevant work as a mail handler, and, therefore, is not disabled. (AR 31-33.)

OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well settled. Findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). At the same time, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision, *Edwards*, 985 F.2d at 336. Here, Hackeloer raises two, principal challenges to the ALJ's decision: (1) he failed to give due weight to the opinion of examining physician Dr. Weber; and (2) he impermissibly cherry-picked from examining physician Dr. Stotz's report. The court will address each challenge in turn.

## I. Treatment of Dr. Weber's Opinion

Plaintiff contends that if the ALJ had given greater weight to Weber's findings, his limitations would have "eroded the occupational base," rendering him disabled. (Pl.'s Br. (dkt. #9) 11.) As described above, Dr. Weber examined Hackeloer on one occasion, diagnosed him with mild depression, and described various limitations based on his mental health. The report reveals that in addition to Weber asking Hackeloer about his mental health complaints, Weber reviewed his health history, assessed his mental status, including behavior and mood, and conducted the Montreal Cognitive Assessment ("MoCA"). In the diagnosis section of the report, Weber also lists "55" for Axis V, which the parties understand to be a Global Assessment of Functioning ("GAF") score of 55, which translates to "Moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."[6]

Although generally more weight is given to the opinion of a medical source who examines a claimant than to the opinion of a non-examining source, 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1), unlike a treating physician, the opinion of a consultative examiner is not entitled to controlling weight. *See Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009) (ALJ not required to assign controlling weight to nontreating source); 20 C.F.R. §§ 404.1502, 416.902 (A nontreating source is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an

---

[6] "Global Assessment of Functioning," Wikipedia, https://en.wikipedia.org/wiki/Global_Assessment_of_Functioning.

ongoing treatment relationship with you."). Instead, the ALJ must weigh the opinion of a consulting doctor in light of the regulatory factors, including: whether the physician supports his opinion with medical signs and laboratory findings; how consistent the physician's opinion is with the evidence as a whole; and whether the physician is a specialist in the allegedly disabling condition. *See Simila*, 573 F.3d at 514 (citations omitted); 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6) (listing factors to consider in weighing medical opinions). The ALJ also must provide reasons for the weight he gives any medical opinion supported by substantial evidence in the record. Soc. Sec. Rul. 96–6p; 20 C.F.R. §§ 404.1527(e), 416.927(e); *Walters v. Astrue*, 444 F. App'x 913, 917 (7th Cir. 2011).

Plaintiff contends that the ALJ picked the more favorable parts of Weber's report, namely his score on the MoCA test of 26, which falls within the normal range, and relied on that rather than the GAF score of 55. While the ALJ did rely on the MoCA score and did not address the GAF score, Weber's report provides a lengthy explanation of the MoCA score, describing Hackeloer's performance on the various assessments, which is in contrast to the GAF score, for which Weber provided *no* explanation.

Moreover, the ALJ's reasons for discounting the limitations Weber placed on Hackeloer's work capacity would also provide a sound basis for discounting the GAF score. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score."). Specifically, the ALJ provided several, reasonable bases for discounting the limitations, which included the normal MoCA score, but also that the opinion is inconsistent with (1) Hackeloer's own assessment of his daily activities, social

12

functioning and concentration capabilities; (2) the assessment by Hackeloer's daughter, who Weber also interviewed, describing his social skills, rating them as 8 out of 10; and (3) Weber's "benign" examination of Hackeloer, noting that his mood was "all right, not great, kind of depressed and under stress" but otherwise his appearance, dress, social life, thought content, *etc.*, were normal. Moreover, the ALJ relied on the fact that there was *no* other evidence of mental health issues in the record, including no diagnosis, no hospitalizations for mental health concerns, and no prescriptions of psychotropic medications.

Given inconsistencies in the report itself (or at least Weber's failure to adequately explain the work limitations in light of the limited mental health issues disclosed in the report as a whole), coupled with inconsistencies in light of other evidence (most notably Hackeloer's own assessment as to his social skills and concentration capabilities), the court finds the ALJ's reasons for discounting Weber's opinions, to be sufficient to justify placing limited weight on his report. As such, the court rejects this basis for remand.

## II. Treatment of Stotz's Opinion

At first glance, Hackeloer's second basis for remand proves a closer call. As described above, Hackeloer lacked insurance during the time of his claimed disability. At the hearing before the ALJ, counsel for plaintiff also provided an explanation of the reasons why he lacked insurance -- Badger Care only covers individuals with minor dependents, which he did not have during that time, and that care was only expanded in April 2014, around the time of Hackeloer's third hearing. (AR 183-84.) As such, the state agency secured consultative examinations with Drs. Stotz and Weber to explore his health

concerns.  The ALJ faults Hackeloer for not securing care -- even suggesting that he should have sought out treatment at "a public health clinic," apparently assuming that such an option is readily available -- but then discounts a consulting examiner's report because of the lack of a medical record and Stotz's apparent reliance on Hackeloer's subjective complaints in determining his functional limitations.  This approach strikes the court as inherently problematic for uninsured claimants.  At the same time, it is not clear what other options are available for a social security applicant with limited medical records, as is true for Hackeloer here.

Even crediting Hackeloer's argument that the ALJ impermissibly discounted Stotz's opinion, however, Stotz's limitations do not appear to be meaningfully different from those adopted by the ALJ.  The RFC provides that Hackeloer can "stand and walk for six hours out of an eight hour workday with regular breaks." (AR 26.)  Stotz concluded that "[b]ased on this patient's subjective history[,] he would have some difficulty performing the following work-related activities: standing in one spot longer than 15 minutes, walking greater than one mile, and traveling for greater than one hour." (AR 386.)  On their face, these limitations are *not* inconsistent with the RFC.  Indeed, during oral argument, counsel for plaintiff conceded that criticism of the ALJ's treatment of Stotz's opinion had weight *only if* the court found error with respect to the treatment of Weber's opinion.  Finding no error with respect to the treatment of Weber's opinion in light of the discussion above, the court rejects this challenge as well.

ORDER

IT IS ORDERED that the decision of defendant Nancy A. Berryhill, Acting Commissioner of Social Security, denying claimant Jeffrey Hackeloer's application for disability and disability insurance benefits is AFFIRMED. The clerk of court is further directed to enter judgment for defendant and close this case.

Entered this 26th day of March, 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge